93 P.3d 1095

**RY–TAN CONSTRUCTION, INC.,**
**an Arizona corporation,**
**Plaintiff–Appellee,**

v.

**WASHINGTON ELEMENTARY SCHOOL DISTRICT NO. 6, a political subdivision of the State of Arizona; The Governing Board of the Washington Elementary School District, a Legislative Body of Washington Elementary School District No. 6, Defendants–Appellants.**

No. 1 CA–CV 03–0248.

Court of Appeals of Arizona,
Division 1, Department E.

July 8, 2004.

Jennings, Strouss & Salmon, P.L.C., by David B. Earl, David J. Cantelme, Phoenix, Attorneys for Defendants–Appellants.

Francis J. Slavin, P.C., by Francis J. Slavin, Ellen B. Davis, Phoenix, Attorneys for Plaintiff–Appellee.

## OPINION

WINTHROP, Judge.

¶ 1 This case arises out of the bid process of a public school construction project. The Governing Board ("the Board") of the Washington Elementary School District ("the School District") voted to award the contract to Ry–Tan Construction, Inc. ("Ry–Tan") as the lowest qualified bidder, and a letter documenting such award was prepared for delivery to Ry–Tan. However, before delivery of the letter or execution of the formal contract documents, a dispute arose between the School District and Ry–Tan, the award was "cancelled," and the project ultimately awarded to the next lowest qualified bidder upon re-bid.

¶ 2 Litigation ensued. The main issues raised in the case, and on appeal, focus on whether a contract was formed and, if so, whether the contract was materially breached by either party. Other issues involve the applicability of certain contractual defenses and the nature of the damages available to the contractor.

¶ 3 Before trial, the court ruled that, as a matter of law, a contract had been formed once the Board voted to accept Ry–

Tan's bid. The trial court also denied multiple motions for summary judgment filed by both parties as to whether certain actions by Ry–Tan constituted material breaches of the contract between the parties.[1] The trial court also ruled as a matter of law that certain defenses raised by the School District (Ry–Tan's failure to comply with the state's general claims statute, and the existence of a "termination for convenience" clause in the contract) did not apply. Finally, the trial court ruled that the Arizona education procurement rules, including the claims procedures outlined therein, applied to this dispute.

¶ 4 The case was tried to a jury, which returned a verdict in favor of Ry–Tan, awarding damages in the amount of $320,200. Ry–Tan filed motions requesting prejudgment interest, attorneys' fees, and costs, all of which the trial court awarded in the final judgment. This timely appeal followed. We have appellate jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) and (F) (2003).[2]

## ANALYSIS

### 1. Contract Formation

¶ 5 Before trial, the court granted partial summary judgment in favor of Ry–Tan on the issue whether a contract was formed with the School District. The School District argues that it did not enter a binding contract with Ry–Tan because, although the Board voted to accept Ry–Tan's bid, the parties never signed, and therefore never formally executed, the contract. We disagree with the School District.

¶ 6 The issue raised by the School District essentially involves a question of law. We review *de novo* the trial court's rulings on issues of law, as well as issues involving contract and statutory interpretation.[3] *See Nangle v. Farmers Ins. Co. of Ariz.,* 205 Ariz. 517, 519, ¶ 10, 73 P.3d 1252, 1254 (App. 2003); *Andrews v. Blake,* 205 Ariz. 236, 240, ¶ 12, 69 P.3d 7, 11 (2003); *Tenet HealthSys. TGH, Inc. v. Silver,* 203 Ariz. 217, 219, ¶ 5, 52 P.3d 786, 788 (App.2002).

¶ 7 In this case, on January 4, 1999, the School District solicited bids for the construction of new classrooms, and Ry–Tan posted a bid bond and submitted the lowest bid. On February 12, 1999, the project architect recommended to the School District that Ry–Tan be awarded the contract, and he forwarded a copy of his recommendation to Ry–Tan.

¶ 8 Representatives from the School District met with Ry–Tan on March 1, 1999, and discussed a previous experience with Ry–Tan relating to a 1995 school construction contract in which Ry–Tan had started construction work prior to asbestos removal by the abatement contractor and which resulted in fines and citations levied by the State against the School District. Ry–Tan's president, Michael Nichols, signed an acknowledgment that Ry–Tan would "take all steps necessary to ensure that this type of situation does not occur again."

¶ 9 On March 11, 1999, the Board met and formally voted to accept Ry–Tan's bid. Nothing in the Board's minutes indicates that the acceptance was conditional. The

---

1. These alleged material breaches included commencing construction before receiving a Notice to Proceed, and before making suitable arrangements for the "safety and convenience" of the students, and failing to "blue stake" utility lines before beginning partial demolition of the bike rack area. The trial court also ruled that Ry–Tan's alleged failure to "timely" deliver payment and performance bonds and liability insurance certificates did not constitute material breaches, and therefore these were not a bar to Ry–Tan's breach of contract action.

2. Throughout this opinion, we cite the current version of the statutes cited by the parties and other applicable statutes where no revisions material to this opinion have since occurred.

3. Additionally, we review *de novo* issues relating to the trial court's grant or denial of summary judgment and judgment as a matter of law to determine whether the trial court applied the proper standards; i.e., whether the evidence and reasonable inferences viewed in the light most favorable to the non-moving party demonstrate that no material issues of fact exist and the movant was entitled to judgment as a matter of law. *See Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 482, ¶¶ 13–14, 38 P.3d 12, 20 (2002); *Orme Sch. v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990); Ariz. R. Civ. P. 50.

Executive Director of Business Services for the School District, Kevin Hegarty, signed a formal Notice to Proceed for the project. The School District scheduled a meeting with Ry–Tan for March 12, 1999, at 3:00 p.m., at which the parties were to formally execute the contract documents and Ry–Tan was to receive the Notice to Proceed.

¶ 10 However, because Ry–Tan brought equipment onto the property on the evening of March 11, 1999, and began work on the morning of March 12 before the meeting, Bob Pickard, Director of Operations for the School District, told Ry–Tan that he would recommend the Board cancel the award and re-bid the project. The School District therefore refused to sign the contract.

¶ 11 Ry–Tan disputed that School District personnel had instructed Ry–Tan not to begin work before the meeting and argued that School District personnel lacked authority to cancel or modify the contract. Although the School District received multiple requests from Ry–Tan to proceed with the project, the Board voted to re-bid the project.

¶ 12 Ry–Tan filed a complaint and later filed a Motion for Partial Summary Judgment Regarding Contract Formation, arguing that a binding and enforceable contract had been created when the Board voted to approve the award of the contract to Ry–Tan and that the signing of formal contract documents was not a condition precedent to contract formation. The School District filed a response and cross-motion for summary judgment on the issue, in which it denied that a contract had been formed. After hearing argument on the motions, the trial court granted Ry–Tan's motion for partial summary judgment that a contract existed:

IT IS FURTHER ORDERED granting [Ry–Tan's] Motion for Partial Summary Judgment on the issue of formation of a contract only. The Court is persuaded by the case of *K.L. Conwell Corp. v. City of Albuquerque*, [111 N.M. 125] 802 P.2d 634 (N.M.1980 [1990]) and *City of Susanville v. Lee C. Hess Company*, [45 Cal.2d 684] 290 P.2d 520 (Cal.1955). The Court finds

there were only ministerial functions left to accomplish once the school board awarded the contract, which it did in the context of its March 11, 1999 meeting. It found, in fact, that [Ry–Tan] was the lowest bidder and [Ry–Tan] was the most responsible bidder. The Court finds that there was a contract formed between the parties as of the date of the School Board vote granting [Ry–Tan] the contract.

¶ 13 The School District relies primarily on language in *Covington v. Basich Brothers Construction Co.*, 72 Ariz. 280, 233 P.2d 837 (1951), as the basis for its argument that the bid and award were mere preliminaries and that a contract was not formed between the parties. In *Covington*, a California construction company, Basich Brothers, submitted a road construction bid accompanied by a $30,000 check, or "proposal guarantee,"[4] to the Arizona State Highway Commission. *Id.* at 282, 233 P.2d at 838. Basich Brothers was the low bidder, but made several attempts to have its check returned, contending that it had overlooked various cost items in making its bid. *Id.* Basich Brothers eventually informed the Highway Commission that if Basich Brothers were not relieved of the contract, it would go through with the project, but it requested that the State Highway Engineer recommend a postponement in the award of the contract. *Id.* at 282–83, 233 P.2d at 838.

¶ 14 The State Highway Engineer declined to do so, and the next day, August 5, 1949, the Highway Commission accepted Basich Brothers' bid, awarded it the contract, and sent notification by mail. *Id.* at 283, 233 P.2d at 838. Basich Brothers received the letter awarding it the contract on August 8, 1949. *Id.* at 283, 233 P.2d at 839.

¶ 15 On August 12, the Highway Commission received a telegram from an employee of Basich Brothers that stated: "Confirming phone call to Mr. Perkins unable to return contract on Ashfork Flagstaff job by Monday 15th account R.L. and N.L. Basich have been out of town on urgent business expected back Tuesday. Respectfully ask for a few days

---

4. The purpose of such a cash guarantee, much like the bid bond required of all bidders for this project, is to enhance the likelihood that if the contractor's bid is accepted by the owner, that contractor will follow through and sign the formal construction contract.

extension of time." *Id.* That same day, the Highway Commission passed and adopted a resolution that stated if Basich Brothers did not execute and return the contract within ten days from the date· of the award, the award would be annulled, the proposal guarantee forfeited to the state, and the next lowest bidder would receive the contract. *Id.* The Highway Commission informed Basich Brothers by telephone and wire that day that it had passed the resolution. *Id.* On August 20, Basich Brothers received a letter written by the Highway Commission on August 17, informing Basich Brothers that, on August 16, the Highway Commission had forfeited the proposal guarantee and awarded the contract to the next lowest bidder. *Id.*

¶ 16 Basich Brothers filed a claim for return of the $30,000 with the Highway Commission and others, but the claim was disallowed. *Id.*. Basich Brothers then brought an action in mandamus to require the Highway Commission to approve its claim for return of the proposal guarantee. *Id.* The trial court issued a writ of mandamus, ordering the members of the Highway Commission to approve Basich Brothers' claim. *Id.*

¶ 17 On appeal, the Highway Commission pointed out that the Arizona Highway Department's *Standard Specifications for Road and Bridge Construction*, which were referred to in Basich Brothers' proposal and were made a part thereof, provided that the contract must be signed with a satisfactory bond "within ten days after the date of the award," and failure to do so "shall be just cause for the annulment of the award and the forfeiture of the proposal guarantee to the state." *Id.* at 283–84, 233 P.2d at 839. Basich Brothers pointed out that the terms of its proposal bid provided that it was to execute the contract and furnish the bond "within ten (10) days *after notice of the award of the contract had been received.*" *Id.* at 284, 233 P.2d at 839 (emphasis added to original).

¶ 18 Our supreme court found that the terms in Basich Brothers' proposal were more specific in nature than, and should govern over, the *Standard Specifications. Id.* at 284, 233 P.2d at 839–40. The court further noted, "Generally forfeitures are abhorred in the law and the party seeking to avail himself of contractual provisions to work a forfeiture must comply strictly with all contract requirements." *Id.* at 284, 233 P.2d at 840 (citing *Glad Tidings Church v. Hinkley,* 71 Ariz. 306, 226 P.2d 1016 (1951); *Phoenix Title & Trust Co. v. Horwath,* 41 Ariz. 417, 19 P.2d 82 (1933)). Finally, the supreme court found that, under the terms of Basich Brothers' proposal, it was entitled to wait until August 18 (ten days after it had received the letter awarding it the contract) to enter into the contract, and that "[t]he action of the commission in forfeiting [Basich Brothers]' 'proposal guarantee' on August 12, to take effect on August 16, was therefore without sanction of law." *Id.* In essence, the supreme court determined that the Highway Commission had revoked the contract and forfeited the guarantee prematurely.

¶ 19 The Highway Commission also challenged whether the action in mandamus was the proper remedy and, in analyzing the issue, our supreme court made the following statements, on which the School District relies almost exclusively for its argument:

> The proposal and award were preliminaries looking toward the execution of a formal contract for the work to be performed. The commission then revoked its award so that the preliminaries were wiped out and the parties were in the same position as before the award was made. The commission had the right to revoke its award at any time before a formal contract was entered into because *a contract with a public agency is not binding on the public agency until a formal contract is executed.* Williston on Contracts (1936) Vol. 1, Sec. 31 says: "In the formation of public contracts the formalities required by law or by the request for bids, such as a written contract, or the furnishing of a bond, often indicate that even after acceptance of the bid no contract is formed until the requisite formality has been complied with." After the commission revoked its award to [Basich Brothers] and awarded the contract to another bidder, [Basich Brothers] w[as] relegated to the position of an unsuccessful bidder.

*Id.* at 285, 233 P.2d at 840 (emphasis added; citations and ellipsis omitted). The supreme

court then determined that Basich Brothers, as an unsuccessful bidder, was entitled to the remedy of mandamus because it would not have an equally speedy and adequate remedy at law. *Id.*

¶ 20 After reviewing *Covington,* and subsequent jurisprudence, we conclude that *Covington* does not compel the result sought by the School District, namely, that the School District had not yet entered a binding contract with Ry–Tan because the formal contract had not been signed by the parties. We note that nothing in the Terms and Conditions or other bid documents in this case requires a writing,[5] and we conclude that *Covington,* a decision in a mandamus action clearly based in equity, must be interpreted in the proper context.

¶ 21 We further note that, in *Covington,* unlike the situation presented here, the contractor first requested that it be relieved of any obligation under its bid proposal before the Highway Commission had even made the award. *Id.* at 282–83, 233 P.2d at 838. However, the Highway Commission contended that, although no award had yet been made, Basich Brothers was committed, absent a failure to make bond; Basich Brothers therefore reluctantly advised the Highway Commission that it would go through with the contract if it could not be relieved of its proposal. *Id.* After Basich Brothers was advised it had been awarded the contract, it had until August 18 to execute the contract under the terms the court found were controlling, and if Basich Brothers failed to do so, it would lose the money it had provided as a guarantee. *Id.* at 284, 233 P.2d at 840. Before the expiration of the deadline, however, the Highway Commission, "without sanction of law," revoked the award. *Id.*

¶ 22 Our supreme court acknowledged that its decision was motivated by the equitable maxim of avoiding forfeitures, and its holding was consistent with the governing contract documents. By being consistent with the contract terms, the court avoided a forfeiture by the contractor. At the same time, its holding that "[t]he commission had the right to revoke its award at any time before a formal contract was entered into because a contract with a public agency is not binding on the public agency until a formal contract is executed" allowed the court to conclude that Basich Brothers was "relegated to the position of an unsuccessful bidder," a conclusion that allowed the contractor to be "entitled to the remedy of mandamus to secure the return of [its] 'proposal guarantee' money."[6] *Id.* at 285, 233 P.2d at 840. Thus, equitable reasons supported the court's determination that a contract had not been formed. We believe that the court's broad statement regarding contract formation must be interpreted in that context. Further, the supreme court's opinion provides no indication that the court was establishing a hard-and-fast rule that would trump different contract terms or different circumstances. Indeed, the entire case rests on the court's application of the governing contract terms, which the court found were contained in the bid proposal, and the equitable maxim of avoiding forfeitures.

¶ 23 The parties here have cited cases from other jurisdictions that support their respective positions regarding contract formation. A series of cases from other states generally holds that, in light of certain statutory requirements or language contained in bid documents, a binding contract is not formed until the formal contract documents are fully executed. *See, e.g., State v. John-*

---

5. Despite the School District's reliance on § IV.A of the bid solicitation, § IV.A appears to establish merely that a vendor may receive notice of acceptance of the contract through alternate means, such as issuance of a formal contract or a purchase order. That section does not require the parties to execute a formal written contract prior to contract formation.

6. The Arizona Supreme Court further explained why the remedy of mandamus was appropriate and preferable, and thus should be applied:

> In an action at law [Basich Brothers] would be put to the task of suing the state and if victorious [Basich Brothers] would then have the burden of securing an appropriation from the legislature to pay [the] judgment. We will take judicial notice of the difficulty that might assail [Basich Brothers], and it is probable that several sessions of the legislature would pass before an appropriation would be made. We think such a remedy would be neither speedy nor adequate.

> *Covington,* 72 Ariz. at 285, 233 P.2d at 840.

*son*, 779 P.2d 778, 783 (Alaska 1989) (holding that the state's letters and conduct were insufficient to form a binding contract with a contractor before issuance of a bid abstract showing the contractor as the apparent low bidder) [7]; *E.H. Oftedal & Sons, Inc. v. State ex rel. Mont. Transp. Comm'n*, 308 Mont. 50, 40 P.3d 349, 357 (2002) (noting that the contract specifications reserved the right to cancel the award prior to execution of the contract and the applicable statute required that the bidder enter into a formal contract following the award); *Pfaff Constr. Co. v. Leonard*, 40 Ohio App. 246, 178 N.E. 328, 329 (1931) (interpreting statutory language to determine "that the making of the contract and the executing of the contract are distinct items"; thus, the contractor had no enforceable rights against municipal authorities until a written contract had been executed); *Wayne Crouse, Inc. v. Sch. Dist.*, 341 Pa. 497, 19 A.2d 843, 844 (1941) (holding that, when a municipal body advertises for bids for public work, "it is within the contemplation of both bidder and acceptor that no contractual relation shall arise therefrom until a written contract embodying all material terms . . . has been formally entered into").

¶ 24 Other states take the opposite view that a binding contract is created when the award is made and communicated to the successful bidder. *See, e.g., City of Susanville v. Lee C. Hess Co.*, 45 Cal.2d 684, 290 P.2d 520, 526 (1955) (recognizing that, when a bid has been accepted, the making of the award gives rise to a contract and the acceptance cannot be revoked); *Horsfield Constr., Inc. v. Dubuque County, Iowa*, 653 N.W.2d 563, 571–72 (Iowa 2002) (concluding that a binding contract was formed upon approval of the contractor's bid "and that the written contract called for by the statute was intended only as a memorial of the [ ] agreement"); *Johnson v. City of Jordan*, 352 N.W.2d 500, 504 (Minn.Ct.App.1984) ("Attachment of a written contract to the request for bids, and direction to city officials to execute that contract with the lowest bidder were objective manifestations of a final acceptance barring reconsideration of the award of the contract."); *K.L. Conwell Corp. v. City of Albuquerque*, 111 N.M. 125, 802 P.2d 634, 638–39 (1990) (holding "that a valid, binding contract was formed" when the bidder received an award letter from the city).[8]

---

**7.** However, in *Johnson*, "the state d[id] not argue that an award could not occur prior to the execution of a written contract." 779 P.2d at 781.

**8.** *American Jurisprudence* recognizes these opposing views in its section on "revocation and recission or termination" of public contracts:

A board or public official charged with the letting of a public contract has general authority to rescind its action in awarding such contract to a particular bidder where no contractual right has vested in the bidder. Rescission has been allowed when made before the statutory bond has been furnished by the contractor or before the contract has been reduced to writing, as required by the statute. Where it is found that a vote or decision of a public body awarding a contract to a bidder is conditioned on the execution of a formal written contract, it has been held that a revocation of the award prior to the execution of such a contract is entirely proper. It is usually held in this situation that the act of making the award is merely a preliminary step in the negotiations, insufficient to formulate a binding contract.

. . . .

Some cases, however, support the general view that, at least under the statutory language involved and the particular facts appearing, a binding contract is created when the award is made and communicated to the successful bidder and that no power remains in the awarding agency to revoke the award even before a formal contract is executed according to the provisions of the controlling statute. There is authority that in the absence of any reservation in the contract of a right to rescind it, public authorities cannot rescind such award and contract, after a bid has been accepted and the contract awarded, without incurring liability for breach of contract, except for some cause that in the eye of the law renders it void or voidable such as fraud or upon the ground that the contractor has failed to prosecute the work with proper diligence or is unable to produce the result contemplated by the contract; in such latter cases it seems that public authorities cannot annul or cancel the contract without notice, particularly if the contract provides for notice. In other words, the public authorities, after having regularly awarded the contract to a bidder, have no right to cancel the award or refuse to go forward with the contract unless they can show the existence of some cause that the law recognizes as sufficient to invalidate the proceedings or that shows a breach of contract by the contractor, and if they cancel or repudiate the contract without good cause they may be held liable in damages. The state has no greater right than individuals to refuse performance of its contract.

■ ¶ 25 Since the *Covington* opinion was issued in 1951, the procedures and formalities surrounding contract formation and the awarding of public contracts in Arizona have changed. Arizona has adopted § 27 of the Restatement (Second) of Contracts. *See Johnson Int'l, Inc. v. City of Phoenix*, 192 Ariz. 466, 470–71, ¶ 26, 967 P.2d 607, 611–12 (App.1998). Section 27 provides as follows:

> Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

Restatement (Second) of Contracts § 27, at 78 (1981).[9] Thus, Arizona courts have adopted a "realist" approach to evaluating the issue of whether an enforceable contract has been formed. "A contract may be formed, even if not formally executed, if it is clear the parties intended to bind themselves to the terms." *Johnson Int'l*, 192 Ariz. at 470–71, ¶ 26, 967 P.2d at 611–12 (citing *AROK Constr. Co. v. Indian Constr. Servs.*, 174 Ariz. 291, 297, 848 P.2d 870, 876 (App. 1993)); *accord Tabler v. Indus. Comm'n*, 202 Ariz. 518, 521, ¶ 10, 47 P.3d 1156, 1159 (App. 2002). Accordingly, we believe that the common law of contracts in Arizona, with the adoption of the Restatement (Second) of Contracts, has evolved since *Covington*.

¶ 26 We also note that the language in *Williston on Contracts*, on which our supreme court relied in *Covington*, did not indicate an inflexible rule limiting contract formation only to situations in which a formal contract had been executed. Instead the language quoted from *Williston* indicates a more flexible approach: "In the formation of public contracts the formalities required by law or by the request for bids, such as a written contract, or the furnishing of a bond, *often indicate* that even after acceptance of the bid no contract is formed, until the requisite formality has been complied with." *Covington*, 72 Ariz. at 285, 233 P.2d at 840 (emphasis added) (quoting 1 Samuel Williston, *Williston on Contracts* § 31 (1936)).

■ ¶ 27 Review of the cases cited in *Covington* as authority for *Williston* also supports the conclusion that, although a contract often may not be created until the formalities of document execution are complied with, a common theme of equity based on factual analysis also exists. *See Edge Moor Bridge Works v. Inhabitants of Bristol County*, 170 Mass. 528, 49 N.E. 918, 918 (1898) ("Where proposals and an award made thereon look to the future execution of the contract, such award is not necessarily a contract of any kind, nor an agreement to enter into a contract based upon the proposals; it is, at most, a matter to be determined whether such an agreement exists, upon a consideration of the terms and purpose of the award, construed in the light of the existing circumstances."); *Franklin A. Snow Co. v. Commonwealth*, 303 Mass. 511, 22 N.E.2d 599, 601–02 (1939) (finding a contract was formed after the contractor knew that, without further action, it had no right to use a nearby quarry); *Camp v. McLin*, 44 Fla. 510, 32 So. 927, 933 (1902) (finding a valid contract to lease state convicts did not exist where a statute required approval of the bond by the board of commissioners of state institutions before the contract could be of any effect, and the bond had not been approved); *State ex rel. McCormick v. Howell*, 26 Del. 387, 84 A. 871, 875–77 (1912) (holding that both an ordinance and the parties contemplated that the contract be reduced to writing and signed, despite the

64 Am.Jur.2d *Public Works & Contracts* § 78, at 711–13 (2001) (footnotes and citations omitted).

9. Comment (a) to § 27 provides the following guidance:

> Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then concluded the contract.

Restatement (Second) of Contracts § 27 cmt. a, at 78–79.

court's acknowledgment that "the acceptance of a bid based upon an advertisement and specifications, or the adoption of a resolution formally awarding a contract to the successful bidder, may constitute a valid and binding contract"); *MacFarlane v. Mosier & Summers*, 157 A.D. 844, 143 N.Y.S. 221, 223 (1913) (avoiding the "drastic penalty of a forfeiture of the contract" by concluding that any violations of the labor laws by the contractor occurred before the contract was formally executed, "for no other contract than a written contract in such case could be a contract between the parties as the charter of defendant city provides"). Thus, the cases relied on by *Covington* (and *Williston*) indicate that the facts and circumstances of a particular case may influence the determination whether a contract has been formed.

¶ 28 Similarly, the modern version of *Williston* reflects that, although contract formation may be contingent on satisfying requisite formalities, such formalities need not be a requirement of execution:

> Even though the charter or ordinances of a municipality expressly require that a contract shall be awarded to the lowest responsible bidder, a contract is not ordinarily formed until the lowest bid is in fact accepted. Though the municipality can make a contract with no other person than the lowest bidder, it need not make any contract at all, since there is no obligation to accept any offer. It should be noted, moreover, that often public authorities are called upon to exercise discretion as to matters other than the fact that a certain bid is the lowest submitted. Under such circumstances, the authority's discretion will not be second guessed by a court. Even in those jurisdictions requiring the lowest bid to be accepted, the authority is typically given discretion to determine whether the lowest bidder is in fact responsible, a determination that is sometimes made in advance by listing certain eligible contractors or eligibility criteria.
>
> In the case of public contracts, certain additional formalities are often required by

statute or by the request for bids under such statutes, such as the execution of a written contract, or the requirement that a satisfactory bond be furnished. In such cases, even after acceptance of the bid has occurred, no contract is formed until the requisite formality has been complied with. However, except in the case of municipal or other public corporations under such statutory disabilities as just suggested, it should be possible for one seeking bids or tenders to make a statement that he will accept the highest tender or bid in such positive terms that the statement will amount to an offer and ripen into a contract for the person thereafter making the highest tender or bid.

1 Samuel Williston, *Williston on Contracts* § 4:10, at 340–46 (4th ed.1990) (footnotes and citations omitted). Thus, *Williston*, both then and now, supports an approach to contract formation based on the applicable facts and circumstances.

¶ 29 Here, the bid documents expressly set forth the various contractual details and, by their very terms, were to be incorporated into the formal contract awarded to the successful bidder. Further, there was no evidence to suggest that the parties were to negotiate any additional terms. Under these circumstances, once the Board determined that Ry–Tan was the lowest and most responsible bidder, and thus approved the award on March 11, 1999, it was clearly the intent of the parties that an enforceable contract was formed. *See* Restatement (Second) of Contracts § 27 cmt. a.

¶ 30 Further, as it relates to the bidding and contracting for school construction projects, Arizona has adopted the Arizona School District Procurement Code ("the Procurement Code"). *See* Ariz. Admin. Code ("A.A.C.") R7–2–1001 to –1195. By its very terms, the Procurement Code controls the adjudication of contractual disputes for such projects. *See* A.A.C. R7–2–1184.[10] Nothing contained in the Procurement Code, let alone the instructions or invitation for bids or the plans or specifications for this project, man-

---

**10.** Additionally, §§ 10.1.1 and 10.4.1 of the contract provide that the Procurement Code governs the contract and all contractual disputes shall be resolved through the exclusive procedures of the Procurement Code.

dates the execution of a written contract before the parties may be bound.[11] Rather, the Procurement Code expressly indicates that "the common law of contracts," the Uniform Commercial Code, and principles of law and equity as applied in Arizona, are controlling. *See* A.A.C. R7–2–1002(D).

¶ 31 Finally, the "Notice to Contractors Inviting Sealed Bids" sets forth the School District's intent as to contract formation:

The Contract will be awarded, if at all, to the lowest responsible and responsive Bidder whose bid conforms in all material respects to the requirements of the bid documents including the Plans and Specifications.[12] "Responsive Bidder" means the Bidder who submits a bid that conforms in all material respects to this Notice Inviting Sealed Bids, Instructions to Bidders, and the Plans and Specifications. "Responsible Bidder" means the Bidder who has the capability to perform the contract requirements and the integrity and reliability to assure complete and good faith performance and who submits the lowest bid.

Although the School District reserved the right to reject any or all bids, and further reserved the right to withhold the award of the contract for up to ninety days, it chose to do neither. Instead, the Board, on March 11, 1999, unconditionally approved the award of the contract for this construction project to Ry–Tan. The execution of a written contract, under these circumstances, was a mere formality.

¶ 32 We conclude that, given the applicable law, the undisputed material facts presented, and the language found in the various bid documents, the trial court properly found that no genuine issue existed as to the formation of a contract between the School District and Ry–Tan, and that such a contract had been formed as a matter of law. The bid and award were more than mere preliminaries, and a contract was formed between the School District and Ry–Tan as of the date of the Board's vote, when the Board found that Ry–Tan was the lowest responsible bidder and made the award.[13]

### 2. *Necessity of Filing a Claim Under A.R.S. § 12–821.01*

■ ¶ 33 The School District argues that the trial court erred in precluding it from raising a defense under Arizona's general

---

11. Citing A.R.S. § 34–221 (Supp.2003), the School District argues that Arizona's statutory scheme "contemplates and requires that contracts with public agencies be in writing, signed by the parties." Section 34–221(E) provides that, in contracts involving public buildings and improvements, "[t]he contract shall be signed by the agent and the contractor." However, this statute also does not mandate signing of the written contract *before* the parties may be bound.

12. This is also consistent with the language contained in the Arizona Education Procurement Code: "The contract *shall* be awarded to the lowest responsible and responsive bidder whose bid conforms in all material respects to the requirements and evaluation criteria set forth in the invitation for bids." A.A.C. R7–2–1031(A) (emphasis added); *see also* A.A.C. R7–2–1050(A) ("The school district *shall* award a contract to the offeror whose proposal is determined in writing to be most advantageous to the school district based on the factors set forth in the request for proposals. No other factors or criteria may be used in the evaluation.") (emphasis added). Under the express terms of the Procurement Code, the word "shall" "denotes the imperative." A.A.C. R7–2–1001 (78).

13. The School District also cites § R7–2–1112(B) of the School District Procurement Code, which states as follows:

The performance bond and the payment bond shall be delivered by the contractor to the school district at the time the contract is executed. If a contractor fails to deliver the required performance bond or payment bond, the contractor's bid shall be rejected, its bid security shall be enforced, and award of the contract shall be made pursuant to this Title.

A.A.C. R7–2–1112. The School District argues that the language of this section supports the conclusion that a formal writing is required, because "[i]f the mere act of accepting a bid proposal created a binding contract, the contractor's failure to deliver the required bonds would constitute a breach of contract, rather than grounds to reject the bid, enforce the bid security, and award the contract to another party." However, we note that § R7–2–1112, which is entitled "Contract performance and payment bonds," does not specifically discuss contract formation. This section could be interpreted to mean simply that a contractor's duty to deliver bonds is a condition precedent to the School District's duty to perform.

claims statute, A.R.S. § 12–821.01 (2003).[14] The School District contends that Ry–Tan was required to serve the School District with a notice of claim within 180 days pursuant to § 12–821.01, did not do so, and the failure to do so should be fatal to Ry–Tan's cause of action.

¶ 34 The School District's argument arises out of the trial court's denial of the School District's motion for summary judgment on this issue. We therefore review this issue *de novo*. *See Wells Fargo Bank*, 201 Ariz. at 482, ¶ 13, 38 P.3d at 20; *Orme Sch.*, 166 Ariz. at 309, 802 P.2d at 1008. Additionally, "[w]e will affirm the trial court's decision if it is correct for any reason, even if that reason was not considered by the trial court." *Glaze v. Marcus*, 151 Ariz. 538, 540, 729 P.2d 342, 344 (App.1986).

¶ 35 In April 1999, Ry–Tan filed its complaint seeking a declaratory judgment, temporary restraining order ("TRO"), and preliminary injunction. The School District responded by filing a "Response to Plaintiff's Application for Temporary Restraining Order, Order to Show Cause and Preliminary Injunction," in which the School District argued in part that damages, rather than specific performance, was the appropriate remedy in a dispute involving a school construction contract. The School District asserted that the contract was governed by the Procurement Code, which provided the "exclusive" procedure and remedy when asserting a cause of action against the School District and specifically allowed for the recovery of damages. The School District further asserted that Ry–Tan "is required to follow the dispute resolution provisions of the procurement code in this matter."

¶ 36 The trial court ordered that a TRO be issued and that the parties provide the court with memoranda on their positions regarding damages, and it set a hearing on whether to convert the TRO to a preliminary injunction. Before the hearing, Ry–Tan filed a First Amended Complaint to add a claim requesting damages; however, Ry–Tan continued to argue that damages were not an appropriate remedy, and Ry–Tan did not serve the School District with a notice of claim pursuant to A.R.S. § 12–821.01.

¶ 37 Citing A.A.C. R7–2–1002(A) and A.R.S. § 15–213(A)(1) (Supp.2003), the School District filed a memorandum in which it argued that the Procurement Code's provisions "shall apply." The School District further argued that the Procurement Code "contains extensive procedures for dispute resolution," and, pursuant to A.A.C. R7–2–1184,[15] "explicitly states that it is the exclusive remedy for school construction controversies."[16] The School District additionally contended that "[t]he Procurement Code allows for the potential of damage awards," and noted that Ry–Tan "asserts that it has met the procedural prerequisites of the Procurement Code, because it has discussed its position with the District's representative

---

**14.** Section 12–821.01(A) provides as follows:

Persons who have claims against a public entity or a public employee shall file claims with the person or persons authorized to accept service for the public entity or public employee as set forth in the Arizona rules of civil procedure within one hundred eighty days after the cause of action accrues. The claim shall contain facts sufficient to permit the public entity or public employee to understand the basis upon which liability is claimed. The claim shall also contain a specific amount for which the claim can be settled and the facts supporting that amount. Any claim which is not filed within one hundred eighty days after the cause of action accrues is barred and no action may be maintained thereon.

**15.** Arizona Administrative Code R7–2–1184 states: "This Article (R7–2–1001 et seq.) provides the exclusive procedure for asserting a cause against the school district and its governing

board arising in relation to any procurement conducted under this Article."

**16.** The School District also noted that, in *R.L. Augustine Construction Co. v. Peoria Unified School District No. 11*, 188 Ariz. 368, 936 P.2d 554 (1997), our supreme court had "declared that the Procurement Code's hearing provisions were inconsistent with A.R.S. § 15–213, which required the Board of Education to adopt Procurement Rules consistent with the procurement practices for the State of Arizona." *See id.* at 370–71, 936 P.2d at 556–57. The School District further noted that, in response, the Board of Education "has adopted revised Rules which amended sections R7–2–1156, R7–2–1158, R7–2–1181, R7–2–1182 and R7–2–1183.... These amendments are awaiting certification from the Arizona Attorney General."

and the Governing Board." Finally, the School District stated that it did

> not contest [Ry–Tan's] ability to assert a breach of contract claim in Superior Court. While the District reserves its right to raise defenses regarding contract formation, breach by the Plaintiff, and the nature of damage relief available to the Plaintiff, the District does not challenge the Court's jurisdiction to hear Plaintiff's breach of contract claim, or the Court's ability to award damages, if justified, to the Plaintiff. . . . Plaintiff's breach of contract claim obviates the need for injunctive relief.

¶ 38 At the hearing to determine if a preliminary injunction should be issued, the trial court vacated the TRO, effectively denying Ry–Tan's request for a preliminary injunction and allowing the School District to re-bid the contract and award it to another bidder. On May 14, 1999, the School District filed an answer to Ry–Tan's First Amended Complaint.

¶ 39 On June 27, 2001, after more than two years of litigation, the School District filed a motion seeking leave to amend its answer to add the affirmative defense that Ry–Tan had failed to timely comply with A.R.S. § 12–821.01; the School District also filed a motion seeking summary judgment on that basis. Ry–Tan filed a response opposing both the School District's motion to amend its answer to add the claims statute defense and the School District's motion for summary judgment based on the claims statute. Ry–Tan argued that the School District's motion to amend was untimely, that Ry–Tan was not required to comply with the general claims statute under the contract, that the School

District had waived and was estopped from asserting the defense, and that the Arizona Procurement Code provided the sole and exclusive remedy for making a claim arising under the Procurement Code against a school district. The trial court denied the School District's motion for summary judgment on the claims statute:

> The court finds that the contract required plaintiff to follow the claims procedures of the Arizona education procurement rules, not A.R.S. § 12–821, Arizona's general claims statute. The procurement rules were not in effect at the time [ ] the claim arose (or there was a substantial question as to their viability) and the defendant initially agreed that the superior court was the appropriate forum for resolving this dispute. The court finds that defendant either waived the plaintiff's failure to comply with the statute, or is estopped from asserting A.R.S. § 12–321 [sic] as a defense.

¶ 40 The School District argues on appeal that the trial court erred and that Ry–Tan's failure to submit a claim pursuant to A.R.S. § 12–821.01 bars its claim. The School District further argues that it did not waive this defense and should not be estopped from raising the defense merely because the School District argued that Ry–Tan was not entitled to specific performance or an injunction because damages would provide an adequate remedy.

¶ 41 We find no error in the trial court's ruling. As the trial court correctly found, the contract entered by the parties required Ry–Tan to follow exclusively the claims procedures of the Procurement Code,[17] not Arizona's general claims statute.[18]

---

17. Section 10.1.1 of the contract states in pertinent part: "All disputes ... under this Agreement shall be resolved pursuant to the Arizona School Procurement Code as the *exclusive means of adjudicating controversies* under this Agreement." (Emphasis added.) Further, § 10.4.1 states in pertinent part:

> Contractor agrees that *all contractual disputes with the Owner and its agents shall be resolved through the exclusive procedures of the Arizona Education Procurement Code A.A.C. R7–2–1001 et seq.* In the event such claim or injury is attributable to the act or omission of the other party, including those acts of his agents, ser-

vants, representatives, or other employees, said claim must be made in writing and must be done as soon as practicable after the party first received notice of said claim or loss.

(Emphasis added.)

18. Ry–Tan argues that the School District has waived its argument regarding the general claims statute by failing to argue this rationale for the trial court's ruling in its opening brief. Generally, issues not clearly raised and argued in the opening brief are waived. *See Jones v. Burk,* 164 Ariz. 595, 597, 795 P.2d 238, 240 (App. 1990). Although the School District has argu-

¶ 42 In addition, the Procurement Code itself states that it "provides the exclusive procedure for asserting a cause against the school district and its governing board in relation to any procurement arising under" the Procurement Code. A.A.C. R7–2–1184. The Procurement Code derives its authority from A.R.S. § 15–213(A), which provides in relevant part that "[t]he state board of education shall adopt rules prescribing procurement practices for all school districts in this state ... consistent with the procurement practices prescribed in title 41, chapter 23 [A.R.S. § 41–2501 et seq.]." Further, A.R.S. § 41–2615 (1999), which is contained in title 41, chapter 23, and is thus a statute with which the Procurement Code is mandated to be consistent, explicitly states that the general claims statute is inapplicable:

> Notwithstanding any law to the contrary, including the provisions of title 12, chapter 7, article 2 and title 12, chapter 9, article 1 [sections 12–820 et seq. and 12–1501], this article and the rules promulgated under this article shall provide the exclusive procedure for asserting a claim against this state or any agency of this state arising in relation to any procurement conducted under this chapter.

(Emphasis added.) [19]

¶ 43 Additionally, the School District's assertions that the Procurement Code provided the "exclusive" procedures and remedy for Ry–Tan to assert its claim, its statement that it did not challenge "the Court's ability to award damages, if justified," and its other concessions regarding its defenses and the applicable claims procedure, which were made in response to Ry–Tan's request for injunctive relief and allowed the School Dis-

trict to avoid the TRO and preliminary injunction, belie its later position that the general claims statute was applicable and barred Ry–Tan's claim. We conclude that the trial court correctly found that the School District waived the right to claim that other administrative procedures applied, and is estopped from asserting A.R.S. § 12–821.01 as a defense. See In re Estate of Cohen, 105 Ariz. 337, 340, 464 P.2d 620, 623 (1970) (applying judicial estoppel); see also Black's Law Dictionary 571 (7th ed.1999), 875 (6th ed.1990) (discussing estoppel by laches).

### 3. Constructive Termination for Convenience

■ ¶ 44 The School District argues that the trial court erred in finding that the School District could not rely on a "termination for convenience" defense.[20] We decline to reverse the trial court.

¶ 45 The School District's argument arises out of the trial court's denial of the School District's cross-motion for summary judgment on this issue. We therefore review this issue de novo. See Wells Fargo Bank, 201 Ariz. at 482, ¶ 13, 38 P.3d at 20; Orme Sch., 166 Ariz. at 309, 802 P.2d at 1008. Additionally, we review the interpretation of contract provisions de novo. See Ahwatukee Custom Estates Mgmt. Ass'n v. Turner, 196 Ariz. 631, 634, ¶ 5, 2 P.3d 1276, 1279 (App.2000). Contract interpretation relies on a standard of reasonableness. Guo v. Maricopa County Med. Ctr., 196 Ariz. 11, 15, ¶ 17, 992 P.2d 11, 15 (App.1999) (citation omitted). In ascertaining the parties' intent, we look to the plain meaning of the words and phrases in the contract, as viewed in the context of the

---

ably waived the issue, we nonetheless address the merits of the School District's arguments.

19. In its Opening Brief, the School District concedes that Ry–Tan's compliance under the Procurement Code is not an issue. The School District also conceded at oral argument on the application for a preliminary injunction and in its Answer to Ry–Tan's First Amended Complaint that Ry–Tan was not required to first adjudicate its claim administratively pursuant to the Procurement Code.

20. Ry–Tan argues that we should not consider this issue because the School District did not

plead termination for convenience as an affirmative defense (and therefore did not preserve it as an issue for appeal). Although Ry–Tan is correct that the School District did not plead termination for convenience as an affirmative defense, we may nonetheless consider the issue because the School District raised it in its cross-motion for summary judgment. See Maricopa Turf, Inc. v. Sunmaster, Inc., 173 Ariz. 357, 363, 842 P.2d 1370, 1376 (App.1992) ("[A] party may raise an affirmative defense in a motion for summary judgment even if the party did not plead that defense.").

agreement as a whole. *Chandler Med. Bldg. Partners v. Chandler Dental Group*, 175 Ariz. 273, 277, 855 P.2d 787, 791 (App.1993); *United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 259, 681 P.2d 390, 411 (App.1983). Thus, we construe the contract in a way that gives effect to each part and brings harmony, if possible, between all parts of the contract. *Chandler Med. Bldg. Partners*, 175 Ariz. at 277, 855 P.2d at 791. Finally, "[w]e will affirm the trial court's decision if it is correct for any reason, even if that reason was not considered by the trial court." *Glaze*, 151 Ariz. at 540, 729 P.2d at 344.

¶ 46 The pertinent facts are as follows: On March 15, 2001, Ry–Tan filed a motion for partial summary judgment regarding the School District's alleged breach of contract. The School District filed a response opposing Ry–Tan's motion for summary judgment and, on June 27, 2001, filed a cross-motion for summary judgment in which it argued for the first time—even though the case had been pending for two years—that the contract allowed it to terminate the contract for convenience.[21] The School District cited § IV(D) of the School District's Terms and Conditions for submitting bids, which provides as follows:

Any contract entered into as a result of this solicitation is for the convenience of the District and as such, may be terminated without default by the District by providing a written thirty (30) day notice of termination.

The School District argued that, although it had not followed the termination procedures of § IV(D), "the termination for convenience clause, even if not properly invoked by the School District, converts Ry–Tan's claim of breach into one of termination for convenience."

¶ 47 The trial court rejected the School District's argument that it had a right to terminate the contract for convenience and therefore could not be liable for breach:

The court concludes that the "termination for convenience" clause, Section IV(D) is inapplicable in this matter. Section IV(D) is limited by Section 17.2 of the contract which provides that any termination can only occur after certain procedural steps. The defendant admits that it attempted to terminate the plaintiff without complying with these procedures. In addition, the court determines that section IVD [sic] conflicts with Arizona Education Procurement Rules, which significantly restricts the ability of a government entity to terminate its contractual obligations. To the extent that Section IV(D) purports to give the defendant the complete discretion to terminate a contractor for convenience, it is ineffective.

¶ 48 On appeal, the School District argues that the trial court "completely missed the concept of constructive termination for convenience" and, in a public contract case such as this, where the School District could have exercised its right to terminate for convenience, but neglected to do so, the trial court should have found a constructive termination.[22]

¶ 49 The doctrine of termination for convenience originated in federal common law with the idea that the federal government could, under certain circumstances, terminate a contract without paying full expectation damages. *See Linan–Faye Constr. Co. v. Hous. Auth.*, 49 F.3d 915, 923 (3d Cir.1995); *see also Torncello v. United States*, 231 Ct. Cl. 20, 681 F.2d 756, 764 (1982) (citing *United States v. Corliss Steam–Engine Co.*, 91 U.S. 321, 23 L.Ed. 397 (1875), as the case first articulating and providing the basic legal theory to support, the modern termination for

---

21. The School District also argued that the contract's dispute resolution provisions required Ry–Tan to first submit its claims to their architect for decision and that Ry–Tan had not done this, and that Ry–Tan had failed to submit its claims for damages to the district representative for initial decision, as required by A.A.C. R7–2–1156. The trial court rejected these arguments. The School District does not challenge these rulings on appeal.

22. The School District concedes that it was not asserting termination for cause and argues, accordingly, that § 17.2 of the contract, which sets forth the termination for cause requirements, does not apply.

convenience clause).[23] The doctrine dates from the winding down of military procurement after the Civil War, and was initially based on the premise that continuing with wartime contracts after the war had concluded was against the public interest.[24] *Linan–Faye,* 49 F.3d at 923 (citing *Torncello,* 681 F.2d at 764); *Maxima Corp. v. United States,* 847 F.2d 1549, 1552 (Fed.Cir.1988). When the federal government terminates a contract pursuant to a termination for convenience clause, a private contractor "is limited to recovery of 'costs incurred, profit on work done and the costs of preparing the termination settlement proposal. Recovery of anticipated profit is precluded.' " *Maxima,* 847 F.2d at 1552 (quoting R. Nash & J. Cibinic, *Federal Procurement Law* 1104 (3d ed.1980)). After World War II, the federal government began to apply termination for convenience to peacetime non-military procurement for the same fundamental purpose—to reduce the government's liability for a breach of contract by allocating to the contractor a share of the risk of an unexpected change in circumstances.[25] *Id.* (citing *Torncello,* 681 F.2d at 765–66).

**23.** The Supreme Court's *Corliss* decision "establishes as basic law and policy that procuring agencies must have the power to settle contracts that have been subjected to great changes in expectations." *Torncello,* 681 F.2d at 764.

**24.** From 1876 through World War II, the legal basis for the federal government's power was "that the great and unpredictable circumstances of war necessitated some ability to halt useless contracts and settle with the contractors." *Torncello,* 681 F.2d at 766.

**25.** The Court of Claims made a "clear break with all of the prior law on the subject" by rejecting the requirement of changed conditions in *Colonial Metals v. United States,* 204 Ct.Cl. 320, 494 F.2d 1355 (1974). *Torncello,* 681 F.2d at 767. However, eight years later, in *Torncello,* the Court of Claims characterized its earlier decision in *Colonial Metals* as a "mistake," determined "that free termination for convenience is not supportable," and held "that the government may not use the standard termination for convenience clause to dishonor, with impunity, its contractual obligations." *Id.* at 771–72. Instead, the court required the federal government to show a "change from the circumstances of the bargain or in the expectations of the parties." *Id.* at 772. *See also* 64 Am.Jur.2d *Public Works & Contracts* § 78, at 712 ("A termination for a convenience clause in a public contract can appropriately be invoked only in the event of some

¶ 50 "Constructive termination for convenience, an outgrowth of termination for convenience, is a judge-made doctrine that allows an actual breach by the government to be retroactively justified." *Linan–Faye,* 49 F.3d at 923 (citing *Maxima,* 847 F.2d at 1553). Although "unrecognized in the procurement regulations that authorize 'actual' termination for convenience," constructive termination for convenience is nonetheless "applied when the basis upon which a contract was actually terminated is legally inadequate to justify the action taken." *Maxima,* 847 F.2d at 1553; *see also Torncello,* 681 F.2d at 759 (stating that constructive resort to a termination clause "occurs in situations in which the government has stopped or curtailed a contractor's performance for reasons that turn out to be questionable or invalid"). The doctrine of constructive termination originated in the United States Supreme Court's decision in *College Point Boat Corp. v. United States,* 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925), a case involving a World War I Navy procurement contract.[26] *See Linan–Faye,* 49 F.3d at 923; *Maxima,* 847 F.2d at 1553.

kind of change from the circumstances of the bargain or in expectations of the parties.").

**26.** In *College Point,* the United States Navy entered a procurement contract with the College Point Boat Corporation for 2,000 collision mats. 267 U.S. at 13, 45 S.Ct. 199. Seventeen days later, the Armistice was signed, and the Navy informed the corporation that the mats would not be needed. *Id.* at 13–14, 45 S.Ct. 199. The federal government made a partial settlement by taking over at cost raw materials that the corporation had purchased or contracted for, but the corporation filed suit to further recover. *Id.* at 14, 45 S.Ct. 199. Although the Court of Claims entered judgment for the corporation for expenditures, services rendered, and charges incurred, the court ruled that no part of the corporation's prospective profits was recoverable because the federal government had canceled the contract. *Id.* In affirming the lower court, the United States Supreme Court first determined that the federal government had not cancelled the contract, despite an unconditional right to do so pursuant to statute, apparently because "neither party knew that the United States had such a right." *Id.* at 15, 45 S.Ct. 199. However, the Supreme Court found that "the right to cancel was not lost by mere delay in exercising it; among other reasons, because the statute conferred upon the government also the power to suspend the contract." *Id.* at 16, 45 S.Ct. 199. The Supreme Court further concluded that a

¶ 51 The doctrine of constructive termination for convenience was further developed by the Court of Claims in *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438 (1963), in which the court determined that, although the federal government terminated its contract with the plaintiff on a basis [27] other than the termination for convenience clause, the government could have relied on that termination for convenience clause; thus, the federal government could constructively terminate the contract for convenience and limit damages to the amount provided for in that clause. *See id.* at 443 [28]; *Linan–Faye*, 49 F.3d at 923–24. Both *College Point* and *John Reiner* involved the *federal* government.

¶ 52 The School District contends that, because constructive termination for convenience is accepted in federal common law, we should invoke constructive termination for convenience in this case. However, the issue presented involves Arizona, not federal, law. *See* A.A.C. R7–2–1002(D).

■ ¶ 53 Nonetheless, as the School District notes, Arizona courts may look to federal authorities for guidance in the area of public contracts. *See Willamette Crushing Co. v. State ex rel. Dep't of Transp.*, 188 Ariz. 79, 81, 932 P.2d 1350, 1352 (App.1997). In *Linan–Faye*, the Third Circuit of the United States Court of Appeals "conclude[d] that in the absence of New Jersey law which specifically interprets 'termination for convenience' clauses New Jersey courts would look to federal common law for guidance." 49 F.3d at 917. The court nevertheless also noted the following:

> The "government" involved in these [constructive termination for convenience] cases is typically the United States government. In the instant case, the entity seeking to terminate for convenience is the Housing Authority of Camden. While the doctrine of constructive termination for convenience originally developed to allow the United States government maximum flexibility to deal with military contractors during times of war, the expansion of this doctrine into areas other than those involving military contracts suggests that its precepts should be applied to all government entities that provide services to the public. *Of course, the final word on this issue rests with the New Jersey Supreme Court.*

*Id.* at 923 n. 11 (emphasis added). The *Linan–Faye* court went on to state that the doctrines of termination for convenience and constructive termination for convenience

> do[ ] not confer upon the government a discretion that is unbounded. In granting the government the privilege of constructive termination for convenience, courts brush up against the problem of allowing the government to create an illusory contract. *See Torncello*, 681 F.2d at 769 (when evaluating a termination for convenience, one cannot ignore hornbook law that "a route of complete escape vitiates any other consideration furnished and is incompatible with the existence of a contract."). Accordingly, courts have articulated limits on the use of the constructive termination for convenience doctrine in various ways. For instance, in *Torncello* the Court of Claims stated that the constructive application of a termination for convenience clause requires "some kind of change from the circumstances of the bargain or in the expectations of the parties." *Id.* at 772.

*Linan–Faye*, 49 F.3d at 924 (emphasis added). Thus, the *Linan–Faye* court recognized

"continuing right of cancellation" existed to limit damages "unless some intervening change in the position of the other party renders that course inequitable." *Id.* Thus, the federal government's actions could be retroactively justified by any reason that could have been advanced at the time of the actions, even though neither party to the contract was then aware of the reason. *See Torncello*, 681 F.2d at 759.

27. The basis relied on by the government was a perceived impropriety in the original bidding procedure that had been identified by a competitor. *John Reiner*, 325 F.2d at 439. However, the Court of Claims held that the award had been lawful. *Id.* at 442.

28. The *John Reiner* court also relied on "[t]he broad termination clause in plaintiff's contract [ ] in the place of the statutory termination power involved in College Point Boat Corp. (the Act of June 15, 1917, 40 Stat. 182)." 325 F.2d at 443.

that, although the doctrine of constructive termination for convenience might be expanded to situations involving state contracts, courts could and do impose reasonable limitations on its use, including a general requirement that the doctrine only be invoked in situations when a change occurs from the circumstances of the bargain or in the expectations of the parties.

¶ 54 Here, the School District's argument, if accepted, would confer nearly unbounded discretion on the School District. The argument is inconsistent with the language of the Terms and Conditions, because the School District is effectively asking this court to ignore the limitation of the thirty-day notice requirement of § IV(D)[29] and interpret that section to allow for an unstated constructive termination for convenience. This we decline to do.

¶ 55 "The jurisprudence makes clear that termination for convenience, whether actual or constructive, is not of unlimited availability to the government, that it is not an open license to dishonor contractual obligations." *Maxima*, 847 F.2d at 1553 (citations omitted). In this case, no unexpected event or "changed circumstances" occurred that might justify retroactive application of the contract termination provision,[30] and we will not reduce the contract between the parties to an illusory contract that vitiates the terms contained in the contract documents, especially where the School District's own actions caused the contract to be terminated.

¶ 56 We are aware that, because the contract was breached before any substantial performance could occur, a policy argument exists that Ry–Tan's recovery should be limited to reliance damages rather than full expectation damages. Even were we inclined to enforce a constructive termination

for convenience to limit damages in this case, which we are not, we would find it poor public policy to do so in a situation where the School District first asserted termination for convenience more than two years after litigation began.

¶ 57 Moreover, public policy does not support terminating a contract with the lowest bidder for a project, and then awarding a contract for the same project to a contractor who submitted a higher bid. In fact, the Procurement Code mandates award of the contract to the lowest qualified bidder. *See* A.A.C. R7–2–1031(A) ("The contract shall be awarded to the lowest responsible and responsive bidder. . . ."). We conclude that, given the lack of changed circumstances, the policy considerations presented, and the requirements of the Procurement Code, the trial court properly denied the School District's cross-motion for summary judgment. We therefore decline to invoke a constructive termination for convenience in this case.[31]

### 4. Issues Relating to Ry–Tan's Alleged Breach of Contract

¶ 58 The School District argues that the trial court erred in failing to find, as a matter of law, that Ry–Tan materially breached the contract between the parties. We disagree with the School District.

¶ 59 We review *de novo* issues relating to the trial court's grant or denial of summary judgment and judgment as a matter of law to determine whether the trial court applied the proper standards; i.e., whether the evidence and reasonable inferences viewed in the light most favorable to the non-moving party demonstrate that no material issues of fact exist and the movant was entitled to judgment as a matter of law. *See Wells Fargo Bank*, 201

---

**29.** Ry–Tan argues that § IV(D) is not among the documents incorporated as part of the contract by § 1.1.1 of the contract. The School District contends, and we agree, that the Terms and Conditions, which contain § IV(D), were included in the Project Manual, and that the Project Manual is one of the documents incorporated in the contract.

**30.** Examples of changed circumstances that might justify invocation of a constructive termination for convenience could include an unexpected disappearance of funding or an extreme

change in the costs and risks involved, such as if large amounts of asbestos were found in a building to be razed or toxic waste were found in the ground surrounding a school construction site. No such circumstances exist here.

**31.** Our decision is not meant to preclude the possibility of finding constructive termination for convenience in a future case where a change occurs from the circumstances of the bargain or in the expectations of the parties.

Ariz. at 482, ¶¶ 13–14, 38 P.3d at 20; *Orme Sch.,* 166 Ariz. at 309, 802 P.2d at 1008.

¶ 60 We note the following procedural history: Ry–Tan filed a motion for partial summary judgment regarding the School District's alleged breach of contract, and the School District filed a response, arguing in part that it was Ry–Tan that had materially breached the contract. The School District also filed a cross-motion for summary judgment for reasons other than those argued here. The trial court ruled that Ry–Tan did not materially breach the contract by failing to "blue stake" before commencing work, that Ry–Tan did not materially breach the contract with respect to supplying payment and performance bonds, and that issues of material fact existed regarding whether Ry–Tan had materially breached the contract by commencing construction before receiving the Notice to Proceed or making convenience and safety arrangements:

> The court concludes that there are issues of material fact with respect to whether the plaintiff materially breached the contract by (a) starting construction activities on the Group III New Classroom Buildings without receiving the notice to proceed and (b) beginning the construction work without making arrangements or appropriate provisions for the children's convenience or safety.

> The court finds that the plaintiff did not materially breach the contract by failing to "blue stake" before beginning the partial demolition of the bike rack area. The contract documents do not require that blue staking occur before beginning above ground demolition. Defendant also alleges that plaintiff violated A.R.S. § 40–360.21 by beginning demolition without blue staking. But even if this allegation is true, compliance with this statute is not a contract requirement.

> The court determines that the plaintiff did not materially breach the contract with respect to supplying the payment and performance bonds.

¶ 61 Ry–Tan moved for clarification and reconsideration of the trial court's decision. Ry–Tan argued that the court had not specifically addressed Ry–Tan's claim that the School District breached the contract by not following contract termination procedures, and requested in part that the trial court clarify and reconsider its ruling that issues of material fact existed regarding whether Ry–Tan had materially breached its contract by starting construction before receiving the Notice to Proceed and making safety provisions, and with respect to whether the parties had mutually rescinded the contract. The School District responded that the trial court's order was clear and that fact questions existed regarding whether Ry–Tan had materially breached the contract and whether the parties had rescinded the contract. The trial court denied Ry–Tan's motion for reconsideration.

¶ 62 Ry–Tan later filed a Final Motion for Partial Summary Judgment, requesting that the trial court find that Ry–Tan did not breach its contract with the School District for failing to provide for student safety and convenience. The School District filed a response opposing Ry–Tan's Final Motion for Partial Summary Judgment, and it moved for partial summary judgment on the grounds that Ry–Tan's alleged premature commencement of work, and failure to warn and take mandated safety precautions, entitled the School District to judgment as a matter of law. The trial court denied Ry–Tan's motion for partial summary judgment (on the basis that questions of fact existed whether a material breach had occurred) and denied the School District's cross-motion for summary judgment (on the basis that it was untimely).

¶ 63 At trial, at the close of Ry–Tan's case, the School District moved for judgment as a matter of law on the issue whether Ry–Tan had materially breached the contract, and the trial court denied the motion. The court ruled that a fact issue existed regarding whether Ry–Tan had materially breached the contract by failing to follow safety requirements, warnings, the progress schedule, and the Notice to Proceed. At the close of evidence, the School District renewed its motion for judgment as a matter of law, and the trial court also denied that motion.

¶ 64 After the trial court entered final judgment on the jury's verdict, the School District filed a motion for new trial and a

motion for judgment as a matter of law. The trial court denied the motions.

## A. Failure to Blue Stake and Submit Insurance Certificates

¶ 65 The School District argues that the trial court erred in finding that Ry–Tan's failure to "blue stake" before commencing work, and its failure to submit insurance certificates, did not constitute material breaches as a matter of law. The School District's arguments arise out of the trial court's grant of Ry–Tan's motion for partial summary judgment.

¶ 66 On the morning of March 12, 1999, before the scheduled 3:00 p.m. meeting, Ry–Tan erected temporary fencing that penetrated the ground and " 'demoed' the asphalt pad under the bike racks," apparently without "blue staking" to identify and locate existing utility lines. The School District maintains that Ry–Tan was obligated to comply with A.R.S. § 40–360.22(A) (2001), which requires the location of existing utility lines, or blue staking, before starting any excavation [32] work. The statute states, in pertinent part: "A person shall not make or begin any excavation in any public street, alley, right-of-way dedicated to the public use or utility easement or on any express or implied private property utility easement without first determining whether underground facilities will be encountered, and if so where they are located...." A.R.S. § 40–360.22(A).

¶ 67 The trial court observed (and the School District appears to concede) that "[t]he contract documents do not require that blue staking occur before beginning above ground demolition." [33] Additionally, it appears that A.R.S. § 40–360.22 is not specifically incorporated as part of the contract.

Further, even if, as the School District suggests, § 40–360.22 must nonetheless be integrated into the contract, see Higginbottom v. State, 203 Ariz. 139, 142, ¶ 11, 51 P.3d 972, 975 (App.2002), it appears that the School District, in its response to Ry–Tan's motion for partial summary judgment, did not dispute (and still does not dispute) Ry–Tan's claims that Ry–Tan previously installed the existing utility lines, and thus knew the location of the lines and that no utility lines were located near the work site. We find no error in the trial court's determination that Ry–Tan did not materially breach the contract by failing to blue stake.

¶ 68 The School District also argues that Ry–Tan materially breached the contract by failing to submit its performance and payment bonds and proof of insurance prior to the commencement of work. The School District waives this issue by not presenting supporting argument or authority on appeal. See AMERCO v. Shoen, 184 Ariz. 150, 154 n. 4, 907 P.2d 536, 540 n. 4 (App.1995). Furthermore, given the School District's conflicting directions as to when the bonds should be submitted, we find no error in the trial court's grant of summary judgment on this issue. [34]

## B. Other Alleged Material Breaches

¶ 69 The School District alleges that Ry–Tan materially breached the contract in numerous other ways, including Ry–Tan's purportedly premature delivery of construction equipment to the project site on the evening of March 11, 1999; commencement of work on the morning of March 12 before receipt of the Notice to Proceed; failure to comply with §§ 13.1.1 and 13.2.2 of the contract, which obligated Ry–Tan to implement

---

**32.** " 'Excavation' means any operation in which earth, rock or other material in the ground is moved, removed or otherwise displaced by means or use of any tools, equipment or explosives and includes, without limitation, grading, trenching, digging, ditching, drilling, augering, tunnelling, scraping, cable or pipe plowing and driving." A.R.S. § 40–360.21(4) (2001).

**33.** We note that, citing § 1.4(D) of the Project Manual, Ry–Tan argued in its motion for partial summary judgment, and argues now, that the Project Manual only required blue staking after

demolition and before construction. Section 1.4(D) states that the contractor "shall be required to contact 'Bluestake' ... two working days prior to the start of construction."

**34.** We also note the record indicates that, on March 12, 1999, Ry–Tan had in force commercial general liability and workers' compensation insurance, and performance and payment bonds. Further, the record reflects that Ry–Tan tendered the insurance certificates and bonds at the March 12 meeting, but the School District rejected them.

all necessary "safety precautions, programs and measures" and to provide "adequate notice and other warnings against hazards" or dangers to anyone "who could reasonably be expected to act in the vicinity of the Project"; and failure to comply with § 7.10.1, which required that Ry–Tan provide a progress schedule upon award of the contract.

¶ 70 We disagree that the School District was entitled to judgment as a matter of law based on these alleged breaches. Section 7.3.1 of the contract provides that the contractor "is solely and exclusively responsible for all construction means, methods, techniques, procedures, sequences, and for coordinating all portions of the Construction Project consistent with the Contract Documents." Further, we find no provision in the contract itself that explicitly prohibits commencement of work prior to actual receipt of the Notice to Proceed.[35] Ry–Tan disputes that it was told to await the Notice to Proceed and the signing of the written contract before commencing work, that it breached by failing to meet safety and warning requirements, and that a progress schedule could have been prepared by March 12. Whether Ry–Tan breached by delivering equipment and commencing work early, ignoring safety and warning requirements, and failing to timely prepare a progress schedule, and whether each of these alleged breaches was material, were disputed issues of fact properly reserved for the jury.

¶ 71 Furthermore, to the extent that the School District challenges the jury's findings, we affirm. With regard to a jury's findings, we view the facts in the light most favorable to sustaining the verdict and resolve conflicts in the evidence and reasonable inferences in favor of the prevailing party; the question of trial court error rests on whether there were sufficient facts to support the jury's verdict. *See St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.,* 154 Ariz. 307, 312, 742 P.2d 808, 813 (1987); *Anderson v. Nissei ASB Mach. Co.,* 197 Ariz. 168, 172, ¶ 10, 3

P.3d 1088, 1092 (App.1999). It is within the jury's province to determine the credibility of the witnesses and to weigh the evidence. *Logerquist v. McVey,* 196 Ariz. 470, 488, ¶ 52, 1 P.3d 113, 131 (2000); *State v. Carlos,* 199 Ariz. 273, 280, ¶ 26, 17 P.3d 118, 125 (App. 2001). A jury is not required to believe even the uncontradicted evidence, much less the contradicted evidence, of an interested party. *See Estate of Reinen v. N. Ariz. Orthopedics, Ltd.,* 198 Ariz. 283, 287, ¶ 12, 9 P.3d 314, 318 (2000).

¶ 72 In this case, issues of fact relating to whether Ry–Tan materially breached the contract were tried, but the jury rejected the School District's contentions. The jury, after considering the evidence before it, found for Ry–Tan, and substantial evidence supports the jury's verdict. *See St. Joseph's,* 154 Ariz. at 312, 742 P.2d at 813; *Anderson,* 197 Ariz. at 172, ¶ 10, 3 P.3d at 1092. Further, there is nothing in the record to indicate that the jury misunderstood the terms of the contract or misapplied the facts to the contract. We find no error in the jury's verdict.

*5. Jury Instruction on Material Breach*

■ ¶ 73 At trial, the trial court provided the jury with the following instruction regarding what constitutes a material breach that excuses performance under a contract:

Both parties contend there's been a material breach of the contract by the other. Material breach occurs when a party fails to do something required by the contract which is so important to the contract that the breach defeats the very purpose of the contract.

Each party has the burden of proving the other committed a material breach.

Material breach by one party excuses performance by the other party to the contract.

The trial court's instruction mirrored the Revised Arizona Jury Instruction ("RAJI") for material breach.[36]

---

35. The Notice to Proceed is dated March 11 and states that "the date of the contract is March 12, 1999." The contract states that work "shall be commenced on the date stated in the Notice to Proceed issued by the Architect."

36. The RAJI for Failure of Consideration–Material Breach states:

[Party] contends that there has been [failure of consideration for] [material breach of] the contract. [Failure of consideration] [material

¶ 74 The School District argues that the trial court erred in instructing the jury as to the definition of a material breach. The School District contends that its proposed instruction, which was a modified version of the RAJI, was an accurate, proper, and more complete statement of the law. The School District had proposed the following modified instruction:

> Defendants contend that Plaintiff materially breached the contract. A material breach occurs when a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions or fails to do something required by the contract which is so important to the contract that the breach defeats the very purpose of the contract.
>
> Defendants have the burden of proving the material breach.
>
> Material breach by one party excuses performance by the other party to the contract[.]

In effect, the School District argues that its proposed instruction was more complete because, in the first paragraph, it added the phrase "when a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions." The School District notes that it derived this phrase from *Olin Corp. v. Central Industries, Inc.*, 576 F.2d 642, 647 (5th Cir.1978) (citing *Gulf S. Capital Corp. v. Brown*, 183 So.2d 802, 805 (Miss.1966)), and argues that *Mitchell v. Straith*, 40 Wash.App. 405, 698 P.2d 609 (1985),[37] which the RAJI for material breach cites as one of its sources, also

could be construed to support inclusion of the proffered phrase in the court's instruction.[38]

¶ 75 On review, we read jury instructions "as a whole with an eye toward determining whether the jury was given the proper rules of law to apply in arriving at its decision." *Thompson v. Better–Bilt Aluminum Prods. Co.*, 187 Ariz. 121, 126, 927 P.2d 781, 786 (App.1996) (citing *Durnin v. Karber Air Conditioning Co.*, 161 Ariz. 416, 419, 778 P.2d 1312, 1315 (App.1989)). "The purpose of jury instructions is to explain the applicable law to the jury in terms that it can understand," and the trial court need not instruct the jury on every refinement of the law suggested by counsel. *Cotterhill v. Bafile*, 177 Ariz. 76, 79–80, 865 P.2d 120, 123–24 (App.1993). We will not overturn a verdict as a result of a jury instruction unless substantial doubt exists whether the jury was properly guided in its deliberations. *Thompson*, 187 Ariz. at 126, 927 P.2d at 786 (citing *Catchings v. City of Glendale*, 154 Ariz. 420, 424, 743 P.2d 400, 404 (App.1987)); *City of Phoenix v. Clauss*, 177 Ariz. 566, 568, 869 P.2d 1219, 1221 (App.1994) (citing *Durnin*, 161 Ariz. at 419, 778 P.2d at 1315). Accordingly, the instructing court "has considerable discretion in deciding whether more specific instructions are necessary to avoid misleading the jury," and we will affirm absent a clear abuse of that court's discretion. *Cotterhill*, 177 Ariz. at 80, 865 P.2d at 124. The giving of an instruction that misleads the jury *and* prejudices a party's substantial rights constitutes reversible error. *Thompson*, 187 Ariz. at 126, 927 P.2d at 786 (citing

---

breach] occurs when a party fails to do something required by the contract which is so important to the contract that the [failure] [breach] defeats the very purpose of the contract.

[Same party] has the burden of proving the [failure of consideration] [material breach].

[Failure of consideration] [material breach] by one party excuses performance by the other party to the contract.
Rev. Ariz. Jury Instr. (Civil) (Contract 9), at 142 (3d ed.1997).

**37.** In *Mitchell*, purchasers of a residential property filed a complaint against the sellers, alleging breach of an express warranty and fraud or misrepresentation in selling the property. 698 P.2d at 610. The trial court dismissed the complaint with prejudice, and the purchasers appeal-

ed. *Id.* On appeal, the Washington Court of Appeals found that the defect complained of (an unusual water piping arrangement) "does not meet the implicit requirements of *Sorrell* [*v. Young*, 6 Wash.App. 220, 491 P.2d 1312 (1971)] and *Obde* [*v. Schlemeyer*, 56 Wash.2d 449, 353 P.2d 672 (1960)] of an undisclosed defect *substantially* affecting the value and usefulness of the property." *Id.* at 613 (emphasis added).

**38.** We note that both *Olin* (1978) and *Mitchell* (1985) were decided before the current Civil RAJI (1997) was promulgated. Had the Arizona State Bar wished to modify the standard instruction regarding material breach based on those cases, it certainly could have done so. However, it chose not to do so, despite its obvious awareness of the language in *Mitchell*.

*Noland v. Wootan,* 102 Ariz. 192, 194, 427 P.2d 143, 145 (1967)); *Clauss,* 177 Ariz. at 568, 869 P.2d at 1221. However, "[w]e will not presume prejudice; it must appear affirmatively in the record." *Clauss,* 177 Ariz. at 568–69, 869 P.2d at 1221–22.

¶ 76 We find no abuse of the trial court's discretion. The trial court gave the standard RAJI for material breach, modified only as necessary to choose among bracketed language and reflect the fact that both parties claimed the other had breached. We neither endorse nor condemn that instruction here. Instead, we find no reversible error because the School District has not argued, much less shown, that the court's instruction prejudiced it; the School District has only argued that its modified instruction was more complete. *See AMERCO,* 184 Ariz. at 154 n. 4, 907 P.2d at 540 n. 4 (citing *Skousen v. Nidy,* 90 Ariz. 215, 217, 367 P.2d 248, 249 (1961), for the proposition that "a party who fails to present argument or authority to support a claim of error waives that claim"); *United Cal. Bank v. Prudential Ins. Co.,* 140 Ariz. 238, 295, 681 P.2d 390, 447 (App.1983) (stating that this court will not presume prejudice; it must be evident from the record). Because the School District has shown no prejudice from the trial court's instruction, we find no error and therefore no abuse of the trial court's discretion.

*6. Exclusion of Evidence*

■■■ ¶ 77 The School District argues that the trial court prejudiced its right to a fair trial by excluding evidence of Ry–Tan's previous experience with the School District pursuant to a 1995 contract.[39] We disagree.

¶ 78 We will affirm the trial court's determinations regarding the admission or exclu-

sion of evidence absent an abuse of discretion or legal error and prejudice. *Brown v. United States Fid. & Guar. Co.,* 194 Ariz. 85, 88, ¶ 7, 977 P.2d 807, 810 (App.1998). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ariz. R. Evid. 403.

¶ 79 About six months before trial, Ry–Tan filed a Motion in Limine to exclude evidence of "Ry–Tan's alleged asbestos violation or breach of contract during its work for [the School District] in 1995 on the grounds that such evidence and testimony is irrelevant and prejudicial and contributes inadmissible character evidence." Ry–Tan cited Rules 401 to 404 of the Arizona Rules of Evidence as the basis for its motion. The School District filed a response objecting to the motion but, after oral argument on the motion, the trial court granted the motion without explanation.

¶ 80 Later, at trial, Ry–Tan's counsel asked Timothy Tyrrell, Ry–Tan's vice president, whether Ry–Tan had begun work in 1995 "before or after the Notice to Proceed was issued." Counsel for the School District objected and, at side bar, counsel for Ry–Tan argued that the question had nothing to do with asbestos, that no trial court ruling had precluded the question he had posed, and that his question was "important to [Mr. Tyrell's] state of mind in terms of his experience with the school district." The trial court noted that the question would open the door to "the issue of the school district's response as to why they didn't want [Ry–Tan] starting on it, and that leads back to the

---

**39.** Much of this issue revolves around the March 1, 1999 meeting between representatives of the School District and Ry–Tan's president, Michael Nichols, which resulted in Nichols signing a memo that acknowledged the following:

> Representatives of the Washington Elementary School District met and discussed their previous contractual experience with representatives of Ry–Tan. In 1995, Ry–Tan was awarded a contract with the Washington Elementary School District for Palo Verde Junior High. *Ry–Tan started construction work prior to asbestos removal by the abatement contractor.*

*This resulted in citations and fines levied by the state against the Washington Elementary School District.*
*Representatives of Ry–Tan understand the consequences of these actions and shall take all steps necessary to ensure that this type of situation does not occur again.*
I have discussed the above situation with Washington Elementary School District and understand Ry–Tan's responsibilities.

(Emphasis added.) A redacted form of this memo was admitted into evidence, with the emphasized portions above redacted.

asbestos issue." Counsel for Ry–Tan argued that he should be allowed to show that starting work before the Notice to Proceed is "not uncommon in school district construction," and that "I've got to have some testimony on what happened at the March 1st meeting ... because if not, then it's going to be simply the meeting was to tell us not to jump the gun." Counsel for the School District argued that, if Ry–Tan were permitted to show that a practice existed of starting work before the Notice to Proceed was issued, then the School District should be allowed to show that "[t]he reason it wasn't followed here was because of asbestos, in part. In fact, in major part." The trial court then sustained the objection.

¶ 81 The School District argues on appeal that the evidence it would have presented "is relevant to the question of [whether Ry–Tan committed a] material breach and was admissible to show Ry–Tan's knowledge, intent, and absence of mistake." *See* Ariz. R. Evid. 402, 404(b). Specifically, the School District argues that evidence of the 1995 incident would show that Ry–Tan had prematurely commenced work on at least one previous construction project and would put into context the March 1, 1999 meeting between representatives of the School District and Nichols by showing their understanding of the contract and that Nichols had been warned not to proceed before issuance of the Notice to Proceed.

¶ 82 However, the excluded evidence was largely cumulative because the jury heard testimony from Joan Kiteley, who had been responsible for construction procurement for the School District, that the purpose of the March 1, 1999 meeting was to convey to Mr. Nichols "to not start the project before a Notice to Proceed was issued," and that Mr. Nichols had acknowledged that Ry–Tan was not to begin work before it received the Notice to Proceed. During closing argument, counsel for the School District also asked the jury to speculate as to what the purpose was for the March 1 meeting and why the March 1 memo had been prepared.

Further, the trial court's redaction of the March 1 memo and preclusion of questions involving the 1995 incident limited *both* Ry–Tan's and the School District's evidentiary presentations. Finally, introduction of the 1995 incident involving asbestos may have confused the issues, and the danger of prejudice from its introduction was great and arguably substantially outweighed its probative value. We conclude that the trial court did not abuse its discretion by precluding evidence of Ry–Tan's previous experience with the School District pursuant to the 1995 contract.

### 7. Prejudgment Interest

 ¶ 83 The School District argues that the trial court erred in awarding Ry–Tan prejudgment interest on the jury's damages verdict. We agree with the School District.

¶ 84 On June 5, 2002, Mr. Tyrrell testified at trial that Ry–Tan's bid profit would have been $320,200, and that was the amount of lost profit that Ry–Tan was requesting as an award.[40] The next day, Ry–Tan presented an expert witness, Leroy Gaintner, who testified that he had been asked to determine whether Ry–Tan could have expected to make a profit had it proceeded with the project and, if so, the amount of expected profit.

¶ 85 Counsel for the School District objected, arguing that Mr. Gaintner's testimony was redundant and therefore unnecessary, because Mr. Tyrrell had already testified as to Ry–Tan's estimated figure for lost profits and Mr. Gaintner would simply be providing his own damage figure based on a historical analysis. Counsel stated that the School District would not challenge Mr. Tyrrell's testimony as to the amount of bid profit, but would challenge breach and causation, and that the School District would forego calling its own expert witness on lost profits if Mr. Gaintner did not testify.

¶ 86 Ry–Tan's counsel initially argued that the jury was entitled to hear Mr. Gaintner,

---

**40.** Although neither party refers to Exhibit 44 in its briefs, Ry–Tan's estimated bid profit appears in part of Ry–Tan's internal documents that were produced as Exhibit 44 for trial. Exhibit 44 provides a detailed calculation of Ry–Tan's cost estimates for the project and shows a calculated estimated profit of $320,201.00.

because his testimony might provide the jury a basis to award more than $320,200, but eventually proposed that, if Mr. Gaintner were excused, the parties inform the jury that a stipulation had been entered regarding the amount of profits to be awarded if the jury were to find the School District in breach. Counsel for the School District agreed, with the caveat that the instruction emphasize that the issue of causation was still disputed. After a recess, counsel for the School District presented the following stipulation to the jury:

> At this point I would like to announce that the school district will not dispute Mr. Tyrrell's testimony from yesterday that the profit to be made, had this job been carried out, was $320,200, which was the amount set forth in Ry–Tan's bid.
>
> We do not, of course, waive or concede any other position in this case, just the question of what the profit would be had it been carried out.

On June 14, 2002, the jury returned a verdict in favor of Ry–Tan and found the full damages to be $320,200.

¶ 87 On July 1, 2002, Ry–Tan filed a Motion for Prejudgment Interest based on the jury's $320,200 verdict and argued that prejudgment interest should be awarded "from April 26, 1999 (the date of filing of the First Amended Complaint) until the date the judgment is paid." The School District filed a response opposing the motion, and the trial court heard oral argument on the issue.[41] The court later issued a September 20, 2002 minute entry, ruling that, because the School District had agreed to the $320,200 figure as a cap on the damages, the School District had conceded that Ry–Tan was entitled to an amount of damages that could be calculated, and Ry–Tan was therefore entitled to prejudgment interest:

> Prejudgment interest can only be awarded if the claim for damages is liquidated. In order to be liquidated, the evidence must provide data, which if believed, makes it possible to compute the amount with exactness. *Alta Vista Plaza v. Insulation Spe-*

*cialists Co[.],* 186 Ariz. 81, 83, 929 [919] P.2d 176, 178 (App.1995). A claim remains unliquidated until the moment the claim can be ascertained by accepted standards of evaluation. *Id.* at 83, 929 [919] P.2d at 178. Damages for lost profits are not liquidated when they depend in any respect for calculation on opinion or discretion. *See Autonumerics, Inc. v. Bayer Industries Inc.,* 144 Ariz. 181, 193, 696 P.2d 1330 (App.1984).

During the course of the trial, plaintiff Ry–Tan Construction Inc. (Ry–Tan), and defendant Washington Elementary School District No. 6 (School district) entered into a stipulation pursuant to which the parties agreed to a figure of $320,200 as the plaintiff's lost profits. This compromise was reached, according to the school district, because it first learned at trial that Ry–Tan would only be claiming the bid profit of $320,200 although Ry–Tan's expert was prepared to testify that Ry–Tan had an historical profit figure of $382,093. Because the defendant's expert was prepared to testify to a figure of $267,427, the school district agreed to the $320,200 figure as a compromise and a "cap" on the damages. But compromise or not, by agreeing to the $320,200, the defendant conceded that plaintiff was entitled to an amount of damages that could be calculated. By stipulating that the "profit to be made, had this job been carried out was $320,202 [sic], the amount set forth in Ry–Tan's bid[,"] the defendant implicitly accepted Ry–Tan's cost estimates for performing the work.

The court finds that this stipulation is sufficient to establish a liquidated amount. *See Peterson Construction v. Carpenters Health Fund,* 179 Ariz. 474, 485, 880 P.2d 694, 705 (App.1994). The defendant did not agree to a compromise number plucked out of the blue; it agreed that plaintiff's bid profit was the amount of plaintiff's damages. The $320,202 [sic] amount was the damage calculation submitted to the jury. If the defendant was asserting that the bid profit was not a figure that was

---

41. At the hearing, the School District argued that "it had never been disclosed to us even one time

that they [Ry–Tan] were going for bid profit."

capable of ascertainment, but merely a compromise, it could have put on evidence to that effect. It did not do so.

Defendant also argues that until the stipulation, plaintiff did not treat its claim for lost profits as liquidated. It is true that Plaintiff never pleaded a claim for prejudgment interest, never disclosed a liquidated claim for damages and never sought summary judgment on its damage claim, although it repeatedly sought summary judgment on the liability issues. But a demand for specific sum in a complaint is not a requirement for recovery of prejudgment interest. *See Contanzo [Costanzo] v. Stewart Title & Trust of Phoenix*, 23 Ariz. App. 313, 316–17, 533 [P].2d 73, 76–77 (App.1975). Moreover, the court will not determine whether a claim is liquidated based on plaintiff's counsel's pretrial motion practice.

The court concludes that the plaintiff is entitled to prejudgment interest on the amount of $320,200, a total of $106,000.

The trial court later denied a motion for reconsideration filed by the School District and, in its final judgment, filed on November 7, 2002, the court awarded Ry–Tan prejudgment interest in the amount of $106,000.

¶ 88 We review *de novo* a party's entitlement to prejudgment interest. *See Gemstar, Ltd. v. Ernst & Young*, 185 Ariz. 493, 508, 917 P.2d 222, 237 (1996). Prejudgment interest generally begins to accrue on the date a claim becomes due. *Id.* When a definite due date does not exist, prejudgment interest generally does not accrue until a plaintiff makes a demand. *See Fairway Builders, Inc. v. Malouf Towers Rental Co.*, 124 Ariz. 242, 264–65, 603 P.2d 513, 535–36 (App.1979). Although prejudgment interest is generally not allowed on unliquidated claims, *see Canal Ins. Co. v. Pizer*, 183 Ariz. 162, 901 P.2d 1192 (App.1995); *Hall v. Schulte*, 172 Ariz. 279, 284, 836 P.2d 989, 994 (App.1992), prejudgment interest on a liquidated claim is a matter of right, and a claim is liquidated if the plaintiff provides a basis for precisely calculating the amounts owed. *Gemstar*, 185 Ariz. at 508, 917 P.2d at 237. In other words, prejudgment interest does not accrue until a plaintiff provides sufficient information and

supporting data so as to enable the debtor to ascertain the exact amount owed. *Alta Vista Plaza, Ltd. v. Insulation Specialists Co.*, 186 Ariz. 81, 83, 919 P.2d 176, 178 (App.1995) (citing *Homes & Son Constr. Co. v. Bolo Corp.*, 22 Ariz.App. 303, 306, 526 P.2d 1258, 1261 (1974)).

¶ 89 Ry–Tan argues that the parties' stipulation regarding the amount of bid profit binds the School District to the conclusion that Ry–Tan's claim had been a figure "capable of ascertainment" since April 26, 1999, the date of its First Amended Complaint. However, the School District did not stipulate that Ry–Tan's claim was liquidated before the stipulation. Instead, the School District merely stipulated that $320,200 was "what the profit would be had [the bid] been carried out." This does not equate to an affirmative stipulation that a specific damages amount could have been precisely calculated before the stipulation. The trial court erred in finding that the stipulation was evidence that the claim was previously liquidated.

¶ 90 Further, the trial court placed the burden on the School District to show that it could not have precisely calculated liquidated damages before the stipulation. However, Ry–Tan bore the burden of providing sufficient information to enable the School District to calculate the amount owed "with exactness, without reliance upon opinion or discretion." *Ariz. Title Ins. & Trust Co. v. O'Malley Lumber Co.*, 14 Ariz.App. 486, 496, 484 P.2d 639, 649 (1971) (citation omitted); *Gemstar*, 185 Ariz. at 508, 917 P.2d at 237; *Alta Vista*, 186 Ariz. at 83, 919 P.2d at 178.

¶ 91 Although Ry–Tan argues that it furnished data by April 26, 1999, from which the School District could calculate the amount of the claim with exactness and without reliance on opinion or discretion, it failed to identify such data and the specific method of calculation in its Motion for Prejudgment Interest, and it fails to point to such data in the record on appeal. As the School District notes, Ry–Tan never pleaded a specific dollar amount of damages in its First Amended Complaint, and we find nowhere in the record that Ry–Tan made a pre-trial demand for its estimated bid profit of $320,200, or disclosed that

number to the School District as the claimed amount of liquidated damages. Even the trial court in its September 20 minute entry observed that Ry–Tan "never disclosed a liquidated claim for damages and never sought summary judgment on its damage claim." Further, the bid form itself does not provide itemization for the expected amount of profit, and we find no specific damage formula in the contract.

¶ 92 Moreover, the fact that both Ry–Tan and the School District continued to dispute the amount of damages until the stipulation at trial, and were prepared to present expert testimony [42] regarding calculation of the amount of lost profits, belies Ry–Tan's argument that the amount was previously liquidated. *See Autonumerics, Inc. v. Bayer Industries, Inc.*, 144 Ariz. 181, 193, 696 P.2d 1330, 1342 (App.1984). Until the parties presented the stipulation to the jury, discretion needed to be exercised, and Ry–Tan's damages were not liquidated.

¶ 93 Finally, although the trial court erred in finding that Ry–Tan's claim was liquidated at the time of the First Amended Complaint, the stipulation clearly had the effect of liquidating Ry–Tan's claim. *See Heard v. Farmers Ins. Exch. Co.*, 17 Ariz.App. 193, 198, 496 P.2d 619, 624 (1972). In fact, counsel for the School District acknowledged that the sides had compromised on the $320,200 bid profit figure as damages and, from the School District's perspective, "the purpose of not disputing that was to essentially cap the dam-

ages in the event that the jury should find liability." Accordingly, we vacate the trial court's award of prejudgment interest and remand for redetermination of prejudgment interest based on liquidation of the claim on the date of stipulation.

### 8. Attorneys' Fees

¶ 94 Both the School District and Ry–Tan request attorneys' fees as the successful party on appeal pursuant to A.R.S. § 12–341.01 (2003).[43] Because neither party has been entirely successful on appeal, we exercise our discretion and decline to award attorneys' fees to either the School District or Ry–Tan. However, because the School District has succeeded in reducing the judgment against it, the School District is entitled to recover its costs on appeal, *see* A.R.S. § 12–342(A) (2003), subject to compliance with Arizona Rule of Civil Appellate Procedure 21(a).

## CONCLUSION

¶ 95 The trial court's judgment is affirmed in part and vacated in part, and remanded for entry of judgment consistent with this decision.

CONCURRING: JEFFERSON L. LANKFORD, Judge and PATRICIA K. NORRIS, Judge.

42. As we have noted, Ry–Tan's expert, Mr. Gaintner, prepared his damage estimate based on a historical profit percentage, samples, and estimates, which appears to this court to lead to an inherently unliquidated damage estimate. Further, Mr. Gaintner's deposition testimony contradicts Ry–Tan's claim that the amount of damages was liquidated by April 1999 because it was calculable with exactness, and without reliance on opinion or discretion:

> The estimated profits at the estimate stage on a construction contract are just that. They are estimates. They [ ] may go up; they may go down. That's part of a risk of a contractor being in business. So the fact that they think front end, it may be somewhere close to this in developing the amount that they are willing to bid on the project is simply to, hopefully, be awarded that contract in order to have the opportunity to execute that contract and see what their actual performance would be.

> So the fact that they have got some buffer, if you will—I'll call it an estimated profit—in their bid estimate just means they expect to make money. *They don't expect to make that amount of money.* They expect to make whatever it is they can do in their best efforts on the job, depending on [how the] subcontractors execute. They control the jobs and so on. (Emphases added.)

43. The School District also cites § 18.3.1 of the contract, arguing that, should the School District be the prevailing party on appeal, § 18.3.1 also applies as a basis for recovery of its attorneys' fees. Section 18.3.1 states that the School District shall be entitled to recover attorneys' fees and costs "in connection with any effort undertaken by [the School District] to enforce any term of this Contract against Contractor and in defense of any Subcontractors' claims against the [School District]."